## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 11 |
| | : |
| PHILADELPHIA RITTENHOUSE DEVELOPER, L.P. | : |
| DEBTOR | : BANKRUPTCY NO. 10-31201 SR |

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

**<u>Introduction</u>**.

Before the Court are two contested matters: The first is a Motion brought by the Debtor's Mortgagee, iStar Tara LLC. It seeks dismissal of the Debtor's Chapter 11 case for cause, including a lack of good faith, or, in the alternative, relief from the automatic stay; the second is a Motion of the Debtor, Philadelphia Rittenhouse Developer, L.P. (the "Debtor") for authority to use cash collateral. Each Movant vigorously opposes the relief sought by the other. A lengthy, combined evidentiary hearing was held, and the parties have submitted extensive proposed findings of fact, conclusions of law and legal memoranda relative to the voluminous record made. The Court has carefully considered the record, the briefs, and governing law. For the reasons which follow the Chapter 11 case will be dismissed.[1]

---

[1] Because the ruling pertains to a request for dismissal of the case and a request for authority to use cash collateral, it is within this Court's core jurisdiction. 28 U.S.C. § 157(b)(2)(A) and (M). This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052 made applicable to contested matters pursuant to Fed.R.Bankr.P. 9014.

## Background

### A.  Pre-petition

The background to the instant disputes is somewhat complex, but much of it is relevant.  A fairly detailed exposition of the history of the case is thus appropriate. This is a single asset real estate case.[2]  The real estate in question is located in Philadelphia and consists of A) a 33 story new construction luxury condominium building, B) an underground parking garage and C) a connected 5 story historic structure known as the Rittenhouse Club.  Collectively the "Project" is commonly referred to as "10 Rittenhouse."  The high rise tower fronts on 18th Street, near Walnut Street, behind what is known as the Allison Building.  The latter building is a low rise structure which sits near the northwest corner of 18th and Walnut Streets, across from Rittenhouse Square.  The parking garage is located underneath the high rise tower. The Rittenhouse Club also fronts on Walnut Street adjacent (to the west) of the Allison Building.

In total the high rise tower consists of approximately 144 residential condominium units.[3]   Units in the Tower on floors 4 through 27 are referred to as "Tower" or "regular" units.  These include studio, one, two and three bedroom units. There are also "Penthouse" or "premium" units in the Tower.  These are located on the

---

[2] See 11 U.S.C. § 101(51B)(defining single asset real estate)

[3]  According to iStar's Appraiser, Joseph Pasqurella of Integra Realty Resources, the original design of the Project contemplated 144 residential units.  During the marketing period some units were apparently combined leaving, according to Pasqurella, a total of 137 saleable residential units (iStar Exhibit #64, 59).  Any discrepancy is immaterial for present puproses.

upper floors. (28 through 32)  There are 3 additional Penthouse units located on the top

3 floors of the Rittenhouse Club.  There are also two commercial units which form part

of the Project.  The first commercial unit comprises the bottom two floors of the

Rittenhouse Club and is leased to the clothing retailer, Barneys, Inc.  The second

commercial unit is situated at the base of the high rise tower and is leased to a

restaurant known as Serafina.

The tower units are largely, but not completely, finished.[4]  The Penthouse units

are in "raw" or "shell" condition, but they are intended to be marketed and sold as such.

The Barney's retail store is open and paying rent, but the Serafina Restaurant was still

under construction at the time of the hearing on these matters and it was not paying

rent.  Approximately 107 residential units remained unsold at the time of the hearing.[5]

The Debtor acquired the real property which constitutes the Project in 2004.  At

that time, the Debtor, a Delaware Limited Partnership, was controlled by a Delaware

Limited Liability Company known as Phila Ritt Dev/GP LLC.  This entity owned a 1%

controlling general partnership interest in the Debtor.  The remaining 99% ownership

stake in the Debtor consisted of limited partnership interests owned in equal shares by

two other entities.[6]  These original partners of the Debtor shall be collectively referred

---

[4] There is an estimated $1 million in finish work remaining.

[5]  The evidence is inconsistent on the precise number of unsold units, which is
understandable given that sales transactions are occurring over time.  The precise number of
remaining unsold units, once again, is not determinative for present purposes.

[6]  The Limited Partners are Phila Ritt Dev ARC GP, a Pennsylvania General Partnership, of
which Robert Ambrosi is the Managing General Partner, and Phila Ritt Dev Wheeler LP, a

(continued...)

to herein as the Original Equity Owners.

On February 24, 2006, Regional Real Estate Investment Corp. t/a Delaware Valley Real Estate Investment Fund, L.P., a Delaware Limited Partnership (hereinafter "DVREIF") agreed to loan the Original Equity Owners up to $25 million for construction and marketing of the Project.  According to the Debtor these funds were to be used as "seed money."  Although the record is some what sparse on the point, it appears that primary construction financing was to be provided via a $136 million first lien mortgage loan from Fremont Investment and Loan Company and a $25 million senior mezzanine loan from iStar (see Stipulated Exhibit #3).[7]  The junior mezzanine DVREIF loan was not secured by a lien on the realty, but was secured by a Pledge, Assignment and Security Agreement, pursuant to which the Original Equity Owners pledged their ownership interests in the Debtor as security for the DVREIF loan.  In February 2007 the DVREIF loan was increased to $30 million and the related loan documents were modified accordingly.  According to the Debtor, the balance owed on the DVREIF loan today is close to $62 million.

In August 2007, under circumstances not entirely clear from the record, the Project financing was materially altered.  At that time, the Debtor and an iStar Tara

---

[6](...continued)
Pennsylvania Limited Partnership, of which Wheeler Brothers LLC, a Delaware Limited Liability Company, was the sole General Partner.

[7] At the outset of the hearing the parties stipulated to the truth, accuracy and admissibility of a set of 30 Exhibits.  They were collectively marked and admitted as Joint Exhibit #1 but will be referenced individually herein as Stipulated Exhibit #___.

affiliate, iStar Financial, Inc., entered into a $216.5 million first lien mortgage loan transaction for construction financing of the Project.  Concurrently therewith, iStar Financial and DVREIF entered into an Inter-Creditor Agreement, pursuant to which the DVREIF Mezzanine loan was subordinated to the new iStar Financing.  Under the Inter-Creditor Agreement, however, DVREIF retained certain rights to exercise the Original Equity Owner's pledge of the Debtor's ownership interests in the event of a default on the DVREIF Mezzanine loan.  In February 2009 iStar Financial assigned all interest in its mortgage loan to iStar Tara, making the latter entity the dismissal/stay relief Movant and Cash Collateral Respondent herein.[8]

With construction financing in place, the development of the Project apparently proceeded apace.  By July 2008, however, the Project had experienced financial setbacks.  Specifically, Robert Ambrosi, on behalf of the Original Equity Owners, informed iStar of a $7.5 million overrun in the "hard costs" needed to complete the project.  This budget overrun caused the iStar loan to fall "out-of-balance."  Failure to bring the loan back "in-balance" within a specified time constituted an event of default under the relevant loan documents.

These circumstances prompted the sending of an August 26, 2008 written notice from iStar to the Debtor and DVREIF, wherein the former advised the latter of various potential consequences that could flow from the situation.  (iStar Exhibit 127).

---

[8] It appears to the Court that, for present purposes, there is little legal distinction worth drawing between the two iStar entities.  Accordingly, except as necessary, iStar Financial and iStar Tara are generally referred to interchangeably herein as "iStar."

The loan was not restored to balance, however a default was not declared at that time.  It appears instead that various remedial efforts to correct the situation were undertaken by the parties.  By the fall of 2009 these had proved unsuccessful and the size of the cost overrun had increased.  In November, 2009, the iStar loan was increased by approximately $35 million via a separate mortgage loan transaction, and other relevant loan documents were modified accordingly.  Both of the iStar Mortgage loans matured and were payable in full on September 1, 2010.[9]

With the additional funding, substantial completion of the Project occurred, however the relationship as among the Original Equity Owners, DVREIF and iStar seriously deteriorated.  It would appear that the debt structure was now such that the perceived value of the Project was less that the combined balance owed to iStar and DVREIF.  This left the Original Equity Owners totally "out-of-the-money," which in turn led to a series of meetings wherein the three parties attempted to reach a consensual, global solution to the Project's financial dilemmas.  (See Stipulated Exhibits #21 and #22).  These negotiations, unfortunately, were unsuccessful.  On July 15, 2010, DVREIF declared a default on its Mezzanine Loan, exercised its Pledge, and assumed control of the Debtor.[10]

_____

[9]   The maturity date was subject to extension upon payment of a fee, but no extension was ever sought or obtained.

[10]   Technically, control of the Debtor rests with a Delaware LLC known as Rittenhouse Pension Investors, LLC.  The latter is an entity formed by DVREIF on July 1, 2010, and to which it assigned its mezzanine loan pledge rights as the vehicle through which to exercise them.  As Rittenhouse Pension Investors is controlled by DVREIF, no distinction between those two

(continued...)

In the aftermath of the takeover, the relationship between DVREIF and the

Original Equity Owners (principally in the form of Robert Ambrosi) remained quite

cordial.[11]  Despite having been involuntarily displaced, Mr. Ambrosi was described by the

Debtor's current management as being a "goodwill ambassador," for the Project and

someone who continues to refer potential sales prospects to it.  He receives no cash

compensation or sales commissions, however he is provided with the free use of an

apartment and parking space and he is welcome to attend staff meetings.

The relationship as between DVREIF, Rittenhouse Pension Investors, and iStar,

on the other hand, became and remains extremely adversarial.  On July 15, 2010

DVREIF charged iStar with a violation of the parties' Inter-creditor Agreement and

advised iStar that it considered that Agreement void.  The next day DVREIF and the

Debtor instituted a civil action against iStar and the Original Equity Owners in the

Philadelphia Court of Common Pleas.  The Amended Complaint, filed in that action in

August 2010, is part of this record. (Stipulated Exhibit #24).[12]

Generally, the Amended Complaint alleges a fraudulent scheme on the part of

---

[10](...continued)
entities will be drawn herein.

[11] This may be because in 2007 the DVREIF Mezzanine loan was increased from $25 to $30 million and the original equity owners assumed personal responsibility for repayment of the additional $5 million.

[12] Count XII of the Amended Complaint seeks a declaratory judgement confirming inter alia that the pledgee properly exercised its rights and that Rittenhouse Pension Investors legally owns the Debtor.  The final resolution of any doubts on this score is not determinative for present purposes, because any doubt has been assumed in favor of the Plaintiffs.

iStar to gain control of the Project for itself and to the detriment of the Debtor and

DVREIF.  iStar and the Debtor have stipulated that, in response to Preliminary

Objections, the State court issued an Order dismissing eight counts of the Amended

Complaint and limiting the relief available on the other counts.  (Stipulated Exhibit #25 -

Order of Judge Arnold L. New dated December 22, 2010).  iStar observes correctly that,

as to it, all claims for equitable relief have been dismissed from the State Court lawsuit.

What remains are claims for compensatory damages.  Generally, these have to do with

the Plaintiffs' contentions that iStar acted in bad faith in connection with the exercise of

its right to approve condominium unit sales transactions.  This misconduct is alleged to

have taken the form of arbitrarily withholding consents, or by imposing burdensome,

unreasonable conditions to the giving of consents, all in a manner designed to prevent

the Debtor from making sales, and in turn making the Debtor's default more likely and

repayment of the mezzanine loan impossible.  As noted, this portion of the State Court

lawsuit remains extant. [13]

On September 15, 2010, iStar, for its part, commenced mortgage foreclosure

proceedings in the Philadelphia Court of Common Pleas.  (Stipulated Exhibit #26)  On

September 17, 2010, iStar filed therein a Petition seeking the appointment of a

Receiver. (Stipulated Exhibit #27)  The foreclosure actions were prompted, in the main,

---

[13]  Of significance, however, of the claims which remain only a breach of contract/bad faith claim in Count IV represents a claim against iStar by the Debtor.  And it is limited to a claim for "pecuniary losses" from the conducted alleged. The other three surviving claims for damages, including the sole claim for punitive damages, are asserted by non-debtors and against non-debtors.

8

by the failure of the two iStar loans to have been repaid on their September 1, 2010

maturity date.  The Petition for the Appointment of a Receiver recites that it was filed

because, inter alia, the Debtor did not appear to have sufficient funds to complete

construction, pay condominium Association fees for the unsold units, or market and

advertise the unsold condominium units for sale.  On or about October 6, 2010 the

Debtor filed Preliminary Objections to the Foreclosure Complaint.  An evidentiary

hearing on the request for a Receiver was held on December 14-15, 2010.  Following it,

at a hearing on December 30, 2010, the State Court denied the Debtor's Preliminary

Objections, and stated its intention to immediately appoint a Receiver for the Project,

subject only to certain modifications being made to the terms of the Plaintiff's Proposed

Order.  While counsel for the parties present at that hearing were about the task of

modifying the Proposed Order, the Debtor contacted separate counsel and directed the

commencement of this Chapter 11 case.  The marked up State Court Order was

docketed at 4:05 p.m. on December 30, 2010 (Stipulated Exhibit #30),  but not before

the filing of the Debtor's Voluntary Chapter 11 Petition at 3:58 p.m.

### B.  Post-Petition

Since the commencement of the case, the Debtor has remained in control of the

Project and is operating its business as a Debtor-in-Possession pursuant to §§ 1107 and

1108 of the Bankruptcy Code.  Technically speaking, however, the Debtor itself has only

an attenuated role in the actual operation of the property, as most all operational

functions are outsourced.  The Debtor, as noted, is controlled by a Limited Liability

9

Company.  An entity known as Dequity Investment Group is the manager of that LLC's

general partner, and an individual named John Decker, the manager of Dequity, is the

10 Rittenhouse Project Director.  Other than Decker, Dequity has but two full time

employees who together perform sales, marketing and administrative support tasks at

the Property.  In addition to the foregoing, there is an Associate Project Director named

Peter Bazeli.  Mr. Bazeli is employed as a Senior Vice President by the Weitzman Group,

Inc., a New York based real estate consulting firm.  Mr. Bazeli is on more or less full

time assignment from the Weitzman Group to work at the 10 Rittenhouse Project as Mr.

Decker's second-in- command.  As will be more fully discussed infra Mr. Bazeli is also

the author of a residential marketing study relative to the Project and was called as a

witness by the Debtor to provide expert testimony in support of the Debtor's proposed

Reorganization Plan. Mr. Bazeli reports to Mr. Decker, who in turn reports to an

individual named Paul Gilbert. The latter is apparently the head of DVREIF.  There are a

variety of other people who work daily at the Project (e.g., building manager, assistant

manager, doormen, concierge staff, garage staff, housekeeping and maintenance

personnel), however these persons are all employees of CAMCO, a professional

homeowners association management company that had been retained by the Original

Equity Owners to operate the property, and which was kept on to do so by DVREIF

after its takeover of the Project.  All of the costs associated with Dequity and the

Weitzman Group, and most of the expense associated with CAMCO, are paid for by

DVREIF.

Cash flow for operations historically had come from drawdowns on the iStar credit facility.  After the September 1, 2010 loan maturity date this ceased, as iStar would not agree to fund no further draw requests (N.T.: 126, 3-31-2011).[14]  According to the Debtor, DVREIF loaned the Debtor approximately $2 million from July 15, 2010 through the Petition date to fund its operations (id. at 105), and has provided an additional $400,948 to fund post-petition operations.

The only potential sources of revenue for the Project, other than loans or capital infusions, are rents from Barneys (and eventually Serafina) and the proceeds from unit sales.  That said, in September 2010 both commercial lessees received direction letters instructing them to remit rents to iStar.  (Stipulated Exhibit #17) As noted, Serafina is not yet paying rent.  Since the petition date, rent from Barneys has been remitted to iStar and escrowed.  Net proceeds of any unit sales, meanwhile, have been remitted to iStar and applied to its debt.  The Debtor seeks recourse herein to both revenue streams in order to fund its operations and ultimately its Reorganization Plan.

The parties disagree, however, over whether, as a matter of law, the rents and the proceeds from condominium unit sales are property of the bankruptcy estate and constitute "cash collateral" in the first place; although they agree that if they are cash collateral, then the Debtor may not utilize the funds absent consent from iStar or permission of the Court.  On December 31, 2010 iStar advised the Debtor that it did not consent to the Debtor's use of cash collateral.  On January 27, 2011 the Debtor filed the

---

[14] All references to hearing testimony will be denoted as (N.T.: page, date).

11

present motion for permission to use cash collateral, together with a request for an

expedited hearing thereon.  The substantive request was opposed by iStar; however on

February 22, 2011 a Consent Order permitting limited use of cash collateral through

March 14, 2011 was entered.  By Order dated March 23, 2011 the interim period for the

permitted limited usage of cash collateral was extended to April 30, 2011.  Subsequent

to the extension Order the parties entered into a debtor-in-possession loan transaction,

basically designed to provide operating funds for the Project pending the resolution of

the two contested matters before the Court.

    As noted, this is a single asset real estate case as that term is defined in 11

U.S.C. § 101(51B).  As such, the case is subject to the provisions of 11 U.S.C. §

362(d)(3), which provide, generally, for relief from the automatic stay unless the Debtor

has, within 90 days after commencement of the case, either filed a plan of

reorganization that has a reasonable possibility of being confirmed within a reasonable

time, or has commenced making regular monthly interest payments.

    The Debtor timely filed a Proposed Plan of Reorganization (March 7, 2011) and

filed an Amended Plan and Disclosure Statement shortly thereafter. (March 13, 2011)

The Amended Plan and Disclosure Statement are pending and, while dismissal and stay

relief hearings are not typically intended to be turned into "mini-confirmation" hearings,

the viability of the proposed plan had an overarching bearing on the merits of the

pending motions, such that its terms and its feasibility perforce figured prominently in

the combined evidentiary hearing.

The basic construct of the Plan is straightforward.  It calls for the Debtor to
retain control of the Project and sell the unsold condominium units to third party
purchasers over whatever period of time it takes to do so.  This time period, sometimes
referred to as the "absorption rate," has been variously estimated to be 3 to 4 years.

The parties agree that iStar is an under-secured creditor, although they disagree
both on the amount iStar is owed, as well as the degree to which the iStar indebtedness
exceeds the value of its collateral.  That said, the Debtor's plan, generally, contemplates
that as units sell iStar will be paid from the sales proceeds an amount dependent on the
size of the sold unit.  Specifically, the plan calls for iStar to receive $517 per square foot
on sales of residential units.[15]  The $517 figure is based on the proposition that the
aggregate value of the property today is $140 million and that the iStar principal debt is
$190 million.  Broadly speaking, the $517 figure is the product of dividing an assumed
value of the secured portion of iStar's claim into the gross square footage of all of the
remaining unsold residential units.

The Plan calls for iStar to release its mortgage lien on a unit upon its receipt of
$517 per square foot.  The balance of sales proceeds from each unit are to be
deposited into a "Plan Fund," from which both the operating expenses of the Project
and administrative expenses will be paid on a going forward basis.  Excess sales
proceeds over and beyond the foregoing are to be retained in the Plan Fund until the

---

[15]  Separate treatment is proposed for sale of the commercial units. The Plan calls for
iStar to receive the net proceeds from the sale of each commercial unit, up to an aggregate of
$11.5 million from both.

13

outcome of the pending State Court litigation, and any Bankruptcy Court litigation,

against iStar.[16]  These litigations, say the Debtor, will determine the amount iStar is

actually owed.  Once that figure is fixed, then distributions from the Plan Fund are to be

made to unsecured creditors, including iStar, if it is shown to hold an unsecured

deficiency claim, and other unsecured creditors. To the extent of funds remaining after

full payment of the aforesaid, DVREIF would be repaid its mezzanine loan.  The Debtor

estimates that the "sell-out" of the condominium units in the manner contemplated will

generate net sales proceeds of $231 million, and that unsecured creditors will, as a

consequence, receive 100% payment on their claims.[17]

iStar, needless to say, claims that the Debtor's proposed plan is patently

unconfirmable.  Its arguments to this effect are numerous and are offered in support of

its requests for both dismissal and stay relief.  Over and beyond them, iStar also argues

that the case is separately subject to dismissal as having been commenced in bad faith.

iStar makes several arguments as to why the Debtor's plan is unconfirmable.

The first argument focuses on the creditor classification scheme.  The Plan classifies

creditors into 5 classes and relegates interest holders to Class 6.  iStar maintains that

the Debtor will not be able to confirm the Plan because it will not have the acceptance

of all creditor classes and that confirmation of the Plan will have to be sought by way of

---

[16]  On the latter score the Debtor initiated an Adversary Proceeding against iStar on
March 13, 2011; however the Complaint was withdrawn without prejudice on April 12, 2011
and the Adversary Proceeding is closed.

[17] Debtor's Disclosure Statement, ¶ IV ; Debtor Exhibit #55.

the "cram-down" provisions of Bankruptcy Code § 1129(b). Under such circumstances,

the Debtor must meet the requirements of § 1129(a)(10), which provides that at least

one class of claims impaired under the Plan has accepted the Plan, such determination

to be made without including acceptance of the plan by any insider.   iStar argues that

none of the classes impaired under the terms of the Debtor's Plan can be relied on for

this purpose.

iStar also strongly argues that the construct of the Plan is fatally flawed to the

extent it proposes to utilize portions of unit sales proceeds to fund operations and pay

junior creditors before the full payment of iStar's secured claim.  iStar characterizes this

aspect of the Debtor's Plan as being an improper diversion of its collateral and an

attempt to transform its fixed term construction loan into a revolving line of credit. As a

corollary to this argument, iStar argues that the Plan violates the absolute priority rule

contained in Bankruptcy Code § 1129(b)(2)(B)(ii), because the proposed payment

scheme contemplates that current equity interest holders will retain their equity

interests and control of the Project during the years anticipated to sell-out the units,

over the objection of senior classes who will not have had their claims satisfied on the

effective date of the Plan.

iStar next challenges the feasibility of the Plan.  Perhaps the largest portion of

the hearings was devoted to this issue.  iStar contends that the Debtor's revenue and

expense projections are materially inaccurate in virtually all respects.  As a collateral

matter, iStar has asserted a threshold challenge to the "expert" testimony offered by

15

the Debtor, arguing that the witness in question, Mr. Bazeli, 1) is not independent, 2) was unqualified to offer expert testimony, and 3) employed methodology in preparing his report that was flawed, thus rendering his conclusions unreliable.  iStar seeks exclusion of the witness' testimony in its entirety.  Notwithstanding the foregoing, iStar argues that, even if one accepts the Debtor's revenue and expense projections, the net funds realized will fall far short of the amount needed to pay all creditor claims.

Lastly, and as previously noted, iStar also urges dismissal of this case on the basis that it was filed in bad faith.  On this score, iStar strenuously asserts that the filing of the case was a transparent litigation tactic prompted by an imminent adverse ruling in the State Court foreclosure litigation, and further that the case, in reality, is a two party dispute between iStar and DVREIF.

For essentially all of the above reasons iStar argues, in the alternative, that if the bankruptcy case is not dismissed, then the automatic stay should be terminated and iStar allowed to resume its foreclosure proceedings in State Court.  This result is further mandated, says iStar, because both the Debtor and DVREIF are bound by pre-petition contractual agreements that prohibit them from contesting iStar's entitlement to automatic stay relief in the event of a bankruptcy filing.

To round matters out, iStar argues 1) that success of the proposed plan depends in the near term on the usage of cash collateral, 2) that as a matter of law there is no cash collateral available to the Debtor, and 3) that even if there were, the Debtor's proposal does not provide iStar with the "adequate protection" to which it is entitled as

a prerequisite to such usage.

The Debtor, once again perhaps needless to say, stakes out a contrary position to each of the contentions of iStar. The Debtor defends the bona-fides of this case and conversely accuses iStar of bad faith conduct. It also argues that its Plan is confirmable under the Bankruptcy Code's cram-down provisions, and that credible fact and expert evidence adduced at the hearing establish that the Plan is both feasible and fair. Lastly, the Debtor argues that the construct of the Plan does, in fact, provide adequate protection to iStar for the preconfirmation usage of cash collateral, and that neither the Debtor nor DVREIF can be held to pre-petition waivers of the protections of the automatic stay, because the same are unenforceable.

The Court will consider the parties' widely divergent views of this case below.

**Discussion**.

**A. Dismissal for Lack of Good Faith**.

The Court begins with what is a threshold and, in this case, dispositive legal issue. As noted in one of the nation's leading bankruptcy treatises, in addition to granting relief for one of the reasons enumerated in Bankruptcy Code Section 1112(b), the Court may dismiss a Chapter 11 case for lack of good faith. Although no provision of the Code expressly authorizes dismissal of a case on this ground, even in the absence of express statutory authorization, the requirement of good faith has been held to be an implicit condition to the filing and maintenance of a bankruptcy case for over a century. 7 Collier on Bankruptcy ¶ 1112.07 (Alan N. Resnick & Henry J. Sommer 16th

ed.)  Controlling appellate authority in this circuit is clear on the point.  In re SGL

Carbon Corporation, 200 F.3d 154, 160 (3d Cir. 1999) (holding that a Chapter 11 case is

subject to dismissal for cause if not filed in good faith.)

        The determination of whether a Chapter 11 case should be dismissed for a

Debtor's lack of good faith requires a fact-intensive inquiry in which courts must

examine the totality of relevant facts and circumstances and determine where the

petition falls along a spectrum ranging from the clearly acceptable to the patently

abusive. In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004).

        Collier also notes some disagreement as to whether, in order to dismiss a case

for lack of good faith, the court must find not only the presence of subjective bad faith,

but also that the Debtor has no realistic chance of reorganization.  7 Collier on

Bankruptcy ¶ 1112.07[6].  The leading case requiring the additional element of

"objective futility" is Carolin Corp. v. Miller, 886 F.2d 693, 700-701 (4th Cir. 1989).

Other courts have held that subjective bad faith alone is sufficient to warrant dismissal.

See, e.g., In re Phoenix Piccadilly, Ltd, 849 F.2d 1393, 1394 (11th Cir. 1988); In re

Metropolitan Realty Corp., 433 F.2d 676, 679 (5th Cir. 1970); MacElvain v. IRS, 180 B.R.

670, 674 (M.D. Ala. 1995).  Courts in this District have adhered to the former line of

reasoning.  See, e.g., In re SB Properties, Inc., 185 B.R. 198, 204 (E.D. Pa. 1995) ("the

issue of good faith includes both subjective and objective dimensions"); SGL Carbon

Corp., 200 F.3d at 165 ("The term 'good faith' is somewhat misleading.  Though it

suggests that the Debtor's subjective intent is determinative, this is not the case.

18

Instead, the 'good faith' filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filing."); In re DCNC North Carolina I, LLC, 407 B.R. 651, 661 (Bankr. E.D.Pa 2009) ("A debtor's subjective good faith is necessary, but not sufficient to avoid dismissal for lack of good faith. The court must also consider whether the attempt to achieve the Debtor's proper goal is objectively futile.")

### i. Subjective Good Faith

For purposes of the above, and in the business bankruptcy context, courts have held that a valid bankruptcy purpose sufficient to support a good faith finding will be the attempt to preserve and rehabilitate a going concern or to maximize the value of a debtor's estate for the benefit of creditors through an orderly liquidation. In re DCNC , supra, 407 B.R. at 661. Conversely, cases filed by a debtor merely to obtain a tactical litigation advantage have been found lacking in good faith. In re 15375 Memorial Corp., 400 B.R. 420, 427 (D. Del. 2009); In re HBA East, Inc., 87 B.R. 248, 260 (Bankr. E.D. N.Y. 1988).

Generally, the facts surrounding good faith will be determined by circumstantial evidence because it is unlikely that a debtor will acknowledge its own bad faith. To facilitate the necessary evaluation, courts have compiled lists of objective factors. One such list of factors is set forth in In re SB Properties, as follows:

(1) the debtor has few or no unsecured creditors;

(2) there has been a previous bankruptcy petition by the debtor or a related entity;

(3) the prepetition conduct of the debtor has been improper;

(4) the petition effectively allows the debtor to evade court orders;

(5) there are few debts to non-moving creditors;

(6) the petition was filed on the eve of foreclosure;

(7) the foreclosed property is the sole or major asset of the debtor;

(8) the debtor has no ongoing business or employees;

(9) there is no possibility of reorganization;

(10) the debtor's income is not sufficient to operate;

(11) there was no pressure from non-moving creditors;

(12) reorganization essentially involves the resolution of a
two-party dispute;

(13) a corporate debtor was formed and received title to its
major assets immediately before the petition; and

(14) the debtor filed solely to create the automatic stay.

185 B.R. at 205.

The parties have addressed themselves to most of the above factors in their

post-hearing submissions so the Court will do likewise herein.

The factors which stand out most prominently are numbers 4 and 14; to wit: that

the filing was occasioned solely to evade a state court order and create an automatic

stay.  As previously discussed, a two day evidentiary hearing had been held in the State

Court foreclosure proceedings incident to iStar's request for the appointment of a

receiver.  Taking nothing away from the allegations separately pending against iStar, on

December 30, 2010, the State Court found that the appointment of a receiver was

appropriate in order to "save the project."  (Stipulated Exhibit #29, 52: 18-19) An Order

dispossessing the Debtor was about to be entered.  Seven minutes before this adverse

outcome was to become a reality, the Debtor commenced this bankruptcy case.  It is

inescapable that the case was commenced solely to avoid the impending Order of the

State Court.  Indeed, the Debtor had obviously mapped out this strategy in advance,

but had held back until the final moments against the event that its opposition to the

receivership proceedings might be successful.  In these respects the filing of the case

represents perhaps the clearest possible example of a litigation tactic.

The Debtor offers no satisfactory rebuttal to this.  The Debtor argues simply that

the mere fact that a Chapter 11 case is triggered by State Court proceedings adverse to

the Debtor does not by itself constitute bad faith.  Assuming arguendo, that this is

correct, it does not make the conduct in question here any less of a transparent, and

particularly blatant, litigation tactic, which in turn is highly probative of the Debtor's

subjective intent and is, indeed, suggestive of bad faith.

Several other of the SB Properties factors are implicated in the case and do not

favor the Debtor.  The Project, of course, is the Debtor's sole asset.  The Debtor itself

has few employees and it has no going concern stream of income from which to

21

operate its business.  Indeed, the Debtor does not seek to reorganize a going concern but seeks leave instead to liquidate its sole asset, albeit over time and under its own control.  Success in the latter respect is absolutely vital to the Debtor, insasmuch as there is no other reorganization option available to the Debtor.

The Debtor alternatively characterizes its proposed plan as both a Reorganization Plan and a Plan of Liquidation.  iStar asserts that the Debtor's proposed Plan is a Plan of Reorganization, and not a Plan of Liquidation, pointing to among other things the fact that that is what the Plan calls itself.  Labels aside, from the Court's perspective there is little doubt that the Plan is the latter; i.e., a Plan of Liquidation, (albeit a most unusual one) and that the present dispute, at bottom, is about who gets to control the process and on what terms.  This is apparent from the Debtor's accusation that iStar, if it obtains control of the Project, would conduct itself in a manner no different than the Debtor, which, it says, would be to finish any unfinished work and proceed to individually market and sell the remainder of the unsold units.

This supposition may or may not be true.  The Debtor, however, is controlled by DVREIF, which excluding any iStar deficiency claim, is by far the Debtor's largest unsecured creditor.  On these facts the Court's sense is that the entire case arises out of concern on the part of DVREIF that if it loses control of the Project (as was about to occur) it will likewise lose hope of a recovery on its enormous mezzanine loan, either because a sell-out over time on iStar's watch will produce net revenues less than iStar's debt, or because if iStar takes title to the Project through foreclosure it will have no

22

obligation to maximize sales proceeds for the benefit of others.  Indeed, it may simply

sell the Project in bulk at a discounted price.  Understandably, neither scenario would

be appealing to DVREIF.  Either way, however, the case bears telling indicia of being

essentially a two-party dispute.

The Debtor takes issue with this and contends that there is substantial other

debt which can only be protected if the Debtor is permitted to remain in Chapter 11 and

prosecute its Plan.  The evidence, however, belies this contention.

iStar Exhibit 128 is a schedule of the Debtor's other unsecured debts.  Leaving

aside for the moment certain claims filed by Robert Ambrosi on behalf of entities he

owns or controls, the general unsecured debt scheduled by the Debtor is

$5,730,083.73.  Of this sum, $4,926,849 is held by the three creditors which form the

Unsecured Creditors Committee in this case.  (Dale Corp, Turner Construction Company

and PZS Architects) Counsel authorized to speak for these 3 creditors appeared in these

proceedings to advise the Court that all three joined in both the dismissal and stay relief

motions; that they could not understand why the case was in bankruptcy to begin with;

and that they would vote against the Debtor's plan if it came to a vote.  (N.T.: 170-172,

3-31-2011).

Deducting the amount of the foregoing three claims from the scheduled debt

leaves $803,234.73.  Of this sum $183,313.90 represents the pre-petition claim of the

condominium homeowners association (the "Homeowners Association").  As will be

discussed in greater detail below, the Homeowners Association is controlled by the

Debtor at this juncture (by virtue of its ownership of the unsold units) and thus the Association's claim is that of an insider.

Deducting the Homeowner Association's claim leaves non-insider unsecured debt of $619,920.83, before consideration of the aforementioned "Ambrosi Claims." iStar argues that these should be disregarded for present purposes. The Court agrees.

The main thrust of the challenge to the Ambrosi Claims is that, if anything, they represent capital contributions by the Original Equity Owners and not loans. The great weight of the evidence tended to support this.

The Ambrosi Claims consist of the following :

> A)    Claim No. 3, filed on behalf of Philadelphia Urban Developer, L.P. in the amount of $3,848,282.63;
>
> B)    Claim No. 4, filed on behalf of Philadelphia Rittenhouse Investors, L.L.C., in the amount of $1,759,756.05.
>
> C)    Claim No. 5, filed on behalf of Philadelphia Rittenhouse Investors, L.L.C., in the amount of $1,759,756.05.
>
> D)    Claim No. 6, filed on behalf of ARC Consolidated Funding, L.L.C. ("ARC Properties"), in the amount of $11,539,103.69.

Counsel for Phila. Ritt. Investors, LLC, agreed on the record that Claim No. 5 is a duplicate of Claim No. 4, so it may be disregarded. The "Ambrosi Claims" thus total $17,147,141.37. These claims are all dated February 11, 2011 and are signed by Mr. Ambrosi. The Claim Form recites that they are for "money loaned," and each has attached to it a single sheet entitled Promissory Note. Each note is dated March 31, 2009, and each is in the precise principal amount the asserted claim states as being

24

owed on the date on which the Bankruptcy case was filed.  (December 30, 2010).  The

Promissory Notes appear to be demand notes in that there is no repayment date

mentioned, and all purport to accrue interest at the rate of 12% per annum.

The evidence adduced with respect to the loans to which the claims purport to

relate cast serious doubt on them.[18]  Three witnesses were called in this respect: A)

John Decker, whose company, Dequity Investment Group, is the manager of the

Limited Liability Company which is the General Partner of the Debtor.  Decker's

company first began performing services for the Debtor in the spring or summer of

2010, while Mr. Ambrosi was still in charge and before DVREIF took control of the

Project.  Decker is responsible for the day to day operations of the development and

sales team at the Project and for interacting with the professional management

company (CAMCO) that runs the Homeowners Association; B) Bruce Nelson, the

Controller and Chief Financial Officier of ARC Properties, and C) Joseph Flynn, the Chief

Financial Officer of DVREIF.

Mr. Nelson, who prepared the proofs of claim at issue, appeared first.  He

testified that Philadelphia Rittenhouse Investors, LLC was the original contract holder

for the purchase of the Project real estate, and that that entity took back a Promissory

Note from the Debtor in the approximate amount of $1.7 million at the time the realty

was transferred to the Debtor.

---

[18] Compounding this, there was conspicuously missing any testimony from those in
control of the Debtor at the time the alleged loans were being made, (such as Mr. Ambrosi), or
any Debtor accounting records that might otherwise corroborate the claims.

25

The precise relationship of Philadelphia Urban Developer to the Debtor (other than as a putative lender) was unclear from anyone's testimony.  It appears from Nelson's testimony that Philadelphia Urban Developer bought realty at the site at the same time that Philadelphia Rittenhouse Investors LLC bought realty, and it may be that the Project realty consisted originally of two parcels, one conveyed to the Debtor by Philadelphia LLC and the other by Philadelphia Urban Developer.  Again, the record is simply unclear on this point.

According to Nelson, ARC Properties is an entity formed to track ARC inter-company loans.

The three Promissory Notes in question were separately admitted into evidence as iStar Exhibits 97, 98 and 99.   These copies of the Notes were produced by Nelson on behalf of the Claimant entities in response to a subpoena.  In addition to the Notes themselves, these copies of the Notes have appended to them schedules which purport to reflect the dates of loans and interest accruals.  On this score, the Philadelphia Rittenhouse Investors schedule reflects the single "loan" referenced above in the amount of $1,759,756.05.  The schedule attached to the Philadelphia Urban Developer note reflects a total of four loans beginning in January 2005 and ending in January 2006.  The ARC Properties schedule purports to reflect dozens of loans beginning in February 2002 and ending in February 2009.  None of the schedules reflect the accrual of interest past March, 2009.

Mr. Nelson testified that he and Mr. Ambrosi created the notes attached to the

Ambrosi Claims and that they were created and signed sometime <u>after</u> the March 31, 2009 date which they bear, although he could not recall exactly when that occurred.[19] On this score, Mr. Nelson initially had no recollection at all as to when the notes were signed.  He later came to recall that the notes were signed sometime before the $35 million increase to the iStar Construction Loan in November 2009.  Mr. Nelson, who works for Mr. Ambrosi, denied that the Notes were backdated, but confirmed that they were created <u>after</u> the loans were actually made, and that they were created because the claimants were having problems with their other partners in the deal and they wanted to document that they had made loans to the Debtor. Nelson testified that the amounts in question are carried on the books of the Claimants as loans.

John Decker testified next.  Mr. Decker testified that he first learned of the existence of the "Ambrosi Loans" on March 11, 2011, at his own deposition taken in anticipation of the present hearings which commenced on March 14, 2011.  Mr. Decker testified on March 24, 2011.  He testified that he was surprised to learn of the purported obligations on March 11, 2011, and that following his deposition he returned to his office and consulted about them with Mr. Flynn, the DVREIF CFO.  He claimed that Flynn informed him that there was "information and tax returns in some general ledger which is being looked at that would make reference to some of these loans." (N.T.: 58-60, 3-24-2011).

Despite the fact that Decker's deposition and his consultation with Flynn took

---

[19] Nelson here contradicted his own sworn testimony, given only moments before, as to when the Philadelphia Rittenhouse Investors Note was created.

place almost two weeks prior to his testimony in Court, at the hearing Decker had no

further information whatsoever about the putative loans, and could add only that Flynn

was still working on the question. Id.  Significantly, the bankruptcy schedules filed by

the Debtor in this case under Decker's supervision (and signed by him) contain no

reference to the alleged Ambrosi loans.

Joseph Flynn, the DVREIF Chief Financial Officer, was the last to testify.

Contrary to Decker's testimony, Flynn, who testified on March 31, 2011, testified that

he learned of the existence of the Ambrosi Notes for the first time when he heard the

testimony of Nelson in open court.  He further testified that Decker had never

previously spoken to him about the Notes, nor instructed him to look into them.  He

also testified that there were no book entries on the books of DVREIF relating to the

obligations, nor journal entries in any general ledger he had seen which reflected the

obligations.  Finally, Flynn testified that since learning of the Notes he had not spoken

with Ambrosi at all about them, but that he had "started to go through these

documents," (referring to the documents Nelson had produced on March 14, 2011), but

that he had "not been able to reconcile to come to any conclusion at this point.")  (N.T.

:118-121, 3-31-2011)

There is other evidence relevant to the "Ambrosi Loans" in the record.  Cynthia

Tucker, an iStar Senior Vice President, and the person responsible for administration of

the iStar loan, testified that iStar had no knowledge of the purported loans.  According

to Tucker, when iStar made its original $216.5 million loan, the total estimated costs for

28

construction of the Project were approximately $257 million, consisting of the iStar loan,

the DVREIF mezzanine loan and $10 million in equity from the Original Equity Owners,

whom she called the Debtor's sponsors.  (N.T.: 92-93, 3-14-2011).  This is confirmed by

a loan closing statement dated August 24, 2007.  (iStar Exhibit 50) The closing

statement was signed in counterparts, by Timothy Doherty, another iStar Senior Vice

President, Paul Gilbert, the managing Director of DVREIF, and Robert Ambrosi on behalf

of the Debtor.  Consistent with Tucker's testimony, there is no reference whatsoever on

the loan closing statement to any indebtedness which corresponds to the putative

Ambrosi loans.  Yet according to the claimants, which again are entities controlled by

Ambrosi, by this date millions of dollars had already been <u>loaned</u> by the Claimants to

the Debtor.

There are a plethora of other indications that the alleged loans are the post-hoc

invention of the Claimants, or the Debtor, or the two acting in concert.  The loan

documents for instance contain representations that the Debtor had no such

indebtedness.  Indeed, any such indebtedness was prohibited.  Construction loan

advances, on other hand, were disbursed pursuant to written draw requests

approximately once a month.  These <u>sworn</u> statements required the disclosure of funds

received from any other sources.  Tucker's unrebutted testimony is that no draw

request ever referenced loans from the Claimants.  iStar Exhibit 59 is a copy of the first

18 Project draw requests.  They are all signed by Ambrosi; they are notarized; and they

make no reference to any loans or even equity infusions from Ambrosi's entities. Yet

during the period the foregoing draw requests cover, ARC Properties (according to the

Schedule attached to iStar Exhibit 93) was loaning hundreds of thousands of dollars to

the Debtor.

iStar points to other problems with the Ambrosi Claimants' contentions, but the

evidence heretofore discussed is already overwhelming.[20]  Leaving aside the rather

ominous implications of fraud, there is no basis whatever to conclude that the claims in

question relate to legitimate loans.

The Debtor's response to the foregoing is shockingly dismissive.  The Debtor

argues that iStar has "proved nothing on the Ambrosi Claim."  (Debtor Reply Brief, 4).

The Debtor stresses 1) that Nelson testified that the claims were valid, that checks

existed, and that dollars were loaned to the Debtor, and 2) that the claims are entitled

to a prima facie assumption of validity until an objection is filed.  The Debtor, however,

misses the larger point.

The Ambrosi claims are being scrutinized at this juncture in the context of

determining the extent of the Debtor's pre-petition unsecured indebtedness.  This will in

turn inform the analysis of whether the bankruptcy case was commenced in good faith

and can survive the instant dismissal motion. The Court has already determined the

filing of the case to have been a transparent litigation tactic in a battle between iStar,

which asserts a total claim of approximately $205 million, and DVREIF, which as noted

above, asserts a total claim of approximately $62 million.  As previously noted, if the

---

[20] For instance, the Schedule of ARC Properties loans reflects loans to the Debtor
beginning in 2002, although the Debtor entity was not even formed until 2004.

claims of the Homeowners Association and the members of the Creditors Committee are

excluded (as the latter properly should be given that these creditors support iStar and

view dismissal or stay relief as being in their best interest), there is a total of

approximately $620,000 of unsecured pre-petition debt remaining.[21]  This translates into

less than 1/4 of 1% of the Debtor's aggregate iStar/DVREIF debt, which together

approaches $270 million.  The enormity of the disparity makes it highly probative, and

made it incumbent on the Debtor to deal with the issue in a fuller way.[22]  In this regard,

it must be remembered that once the question of the Debtor's good faith has been

placed into issue the Debtor bears the burden of establishing good faith.  SGL Carbon,

supra, 200 B.R. at 160.

The Court recognizes that vis-a-vis the relevant factors set forth in SB Properties,

supra, the SB Court itself cautioned against the over-emphasis of any one factor, and

counseled against mere "indicia counting."  The Court has followed that admonition

herein, yet even having done so the Court is left with an unwavering conviction.  The

great majority of the SB Properties factors are evidenced in the record before it, some

to a particularly egregious degree, and the Court concludes, with little hesitancy, that

---

[21]  There was testimony concerning a $700,000 Philadelphia Real Estate tax bill, but it is the Court's understanding that this represented a post-petition obligation which has since been paid.

[22] The Debtor emphasizes, and the Court acknowledges, that the holders of the Debtor's non-iStar/DVREIF debt comprise some 40 creditors.  However, 27 of these are for debts of less than $5,000.  Moreover, there is no evidence that pressures from the holders of any non-movant trade indebtedness had anything whatsoever to do with the initiation of this case. Where, as here, the indebtedness which does lie at the root of the filing is so vastly in excess of any other debt, the Court believes it appropriate to place greater weight on the amount of the debt than the number of holders.

the Debtor's bankruptcy case was not commenced with subjective good faith.  Having

made this finding, the Court turns to the objective prong of the good faith analysis and

the question of whether the Debtor's Plan has any reasonable possibility of

confirmation.

### ii.  Objective Futility

iStar has leveled a barrage of criticism at the Debtor's proposed plan and the

Court agrees that the instant Plan could never be confirmed.[23]  As with the inquiry into

subjective good faith, certain deficiencies stand out.  On this score there are at least

three independent deficiencies in the Plan which render it unconfirmable: these are 1)

violation of the absolute priority rule; 2) failure of the Plan to provide for

preconfirmation adequate protection with respect to the Debtor's proposed usage of

cash collateral, coupled with the failure of the plan to provide for iStar's post

confirmation realization of the indubitable equivalent of its secured claim; and 3) the

Debtor's inability to satisfy the requirement of 11 U.S.C. § 1129(a)(10) - (Acceptance of

its Plan by an impaired class of creditors.) The Court will address these deficiencies

below.

### A.  The Absolute Priority Rule

First and foremost, the Plan clearly violates the Absolute Priority Rule.  Whether

one views it as a Reorganization Plan or a Liquidation Plan, the proposed plan must still

be fair and equitable in respect of, and not discriminate unfairly against, impaired

---

[23] This is a particularly important point because, as previously noted, the Debtor has no
other viable Plan option.

classes of creditors which have not accepted the Plan.  To do so the terms of a Plan

such as is now before the Court must satisfy the Absolute Priority Rule.  Under the

Absolute Priority Rule a Chapter 11 Plan cannot be confirmed via cram down over the

objections of an unpaid senior class of creditors if a junior class will receive any

property.  11 U.S.C. § 1129(b)(2)(B)(ii).  The Debtor's Plan fails this test.  Indeed, at

the outset of these proceedings the Court expressed its own initial skepticism that the

Debtor's Plan adequately dealt with this issue.  Nothing has changed in that regard.

 The proposed Plan calls for the Debtor's interest holders to retain their interests

until the Plan is completed, as follows:

> **4.6 Class 6**.  Interest Holders.  Class 6 is impaired. All
> existing membership interests shall be retained but the
> holder shall not receive a distribution on account of the
> interest in the Debtor until Classes 2, 3, 4 and 5 have been
> paid in full unless Class 2 is subordinated or disallowed.

Debtor's First Amended Plan, Art. IV, ¶ 4.6, 14

 The proposed sell-out period, even by the Debtor's estimation, will be 3 to 4

years.  During this period the Plan calls for the Debtor to control the Project and permits

the Debtor to invade the unit sales proceeds for the payment of operating and

administrative expenses.  iStar argues that the retention of this bundle of rights and

economic benefits constitutes property, and that in order for the Debtor's interest

holder (which is effectively DVREIF) to retain such property, it must expose the interest

in question to a market auction consistent with the holding of the United States

Supreme Court in Bank of Am. Nat'l Trust and Sav. Assoc. v. 203 N. LaSalle P'shp, 526

U.S. 434, 458, 119 S.Ct. 1411, 1424 (1999) (rejecting confirmation of Chapter 11 Plan that proposed less than full payment to unsecured creditors while allowing equity holders to retain control of reorganized debtor).  The teaching of the LaSalle decision is that the Debtor must permit the market to test the premise that the interest to be retained has value or has no value.  The Debtor's plan, as noted, makes no provision for that.

The Debtor argues, however, that in this case the LaSalle decision will either not be implicated, or if it is, it will not be violated.  In the former respect, the Debtor argues that the existence of the LaSalle issue herein is premised on iStar having an unsecured deficiency claim that will enable it to control the vote of the general unsecured creditor class (Class V).  The Debtor believes that via litigation it can eliminate or sufficiently reduce the iStar claim such that its dominance of the unsecured class will not be possible.  In the latter respect, the Debtor argues that the LaSalle decision is inapposite in this context because under the proposed plan interest holders are to receive no monetary distributions until all senior creditors are paid in full.  Neither of the Debtor's arguments has merit.

As previously noted, the unsecured debt scheduled by the Debtor is approximately $5.7 million.  The claims of the creditors which constitute the Official Committee of Unsecured Creditors comprise over 85% of the total.  As noted, the three creditors in question support dismissal of the case and have indicated they would vote against the Debtor's Plan.  Irrespective of any iStar deficiency claim, therefore, the

34

LaSalle issue will be implicated.

By all indications, moreover, it appears that iStar will in fact have a substantial deficiency claim.  The evidence of record established that the total iStar claim is approximately $205 million.  (iStar Exhibits 83, 83A; N.T.: 46-50, 3-29-2011) The only credible valuation testimony came from iStar's appraiser, Joseph Pasquarella, who valued the Project, as of February 16, 2011, at $140,200,000. (iStar Exhibit 64)

The Debtor did not present contrary valuation evidence.  Indeed, the Debtor's own plan utilizes the Pasquarella figure.  If the Pasquarella figure is assumed to be the value then iStar would have a deficiency claim of approximately $65 million.

The Debtor, of course, indicated that it would seek to disallow any iStar deficiency claim for voting purposes, although it had taken no steps to do so.  In this respect, however, the Debtor relies heavily on its ability to reduce or eliminate the claim via the State Court litigation still pending against iStar.  But as  previously noted, all claims for <u>equitable</u> relief in that lawsuit have been dismissed.  The only remaining claims of the Debtor against iStar are for monetary damages for breach of contract and/or tortious interference.  A perusal of the demand set forth in the Complaint reflects that the <u>maximum</u> amount recoverable by the Plaintiffs on these claims, if they are <u>completely</u> successful, is between $10 million and $20 million.  Thus, it would appear that under any scenario iStar will hold a deficiency claim sufficient to control the vote of Class V.

This leaves the Debtor's alternative argument; to wit: that even if the LaSalle

decision is implicated, the Plan does not run afoul of it because it does not propose cash

distributions to interest holders until senior class claims are paid in full.  The crux of this

argument is the proposition that the interest holders retention of their interests under

these circumstances represents nothing of value and is therefore not property.  Indeed,

the Debtor characterizes the interest being retained during the years attendant to the

sell-out of the Project as being "in the nature of a fiduciary managing and liquidating a

fixed asset." (Debtor's Brief, 31) No "economic benefit" is being retained, says the

Debtor, "on account" of the equity position.

Yet this <u>precise</u> argument was expressly rejected by the LaSalle Court, and has

been rejected here by our own Circuit Court:

> But before the Debtor's plan was accepted no one else could
> propose an alternative one, and after its acceptance no one
> else could obtain equity in the reorganized entity. At the
> moment of the plan's approval the Debtor's partners
> necessarily enjoyed an exclusive opportunity that was in no
> economic sense distinguishable from the advantage of the
> exclusively entitled offeror or option holder. This opportunity
> should, first of all, be treated as an item of property in its
> own right. Cf. In re Coltex Loop Central Three Partners, L.
> P., 138 F.3d, at 43 (exclusive right to purchase post-petition
> equity is itself property); In re Bryson Properties, XVIII, 961
> F.2d, at 504; Kham & Nate's Shoes No. 2, Inc. v. First Bank,
> 908 F.2d 1351, 1360 (C.A.7 1990); D. Baird, The Elements
> of Bankruptcy 261 (rev. ed. 1993) ("The right to get an
> equity interest for its fair market value is 'property' as the
> word is ordinarily used.)

(LaSalle supra, 526 U.S. at 455, 119 S.Ct. at 1422)

> We do not believe that these releases were made "on
> account of" KKR's junior interest as that phrase is construed
> in 203 North LaSalle. What doomed the plan in 203 North

36

> LaSalle was not that old equity received property under the
> plan, but the "exclusivity" that old equity enjoyed, which
> suggested that old equity might have obtained the interest
> for less than someone else might have paid. Under the 203
> North LaSalle plan, old equity set the price for the interest it
> obtained under the plan, and the right to set this price
> amounted to a property right in itself:
>
> > Hence it is that the exclusiveness of the opportunity with its
> > protection against the market's scrutiny of the purchase
> > price by means of competing bids or even competing plan
> > proposals, renders the partners' right a property interest
> > extended "on account of" the old equity position and
> > therefore subject to an unpaid senior creditor class's
> > objection.  Id. at 456, 119 S.Ct. 1411.

In re PWS Holding Corporation, 228 F.3d 234, 238-239 (3d Cir. 2000)

The only decision the Debtor cites in support of its position is a 2007 Bankruptcy Court decision from the Middle District of Alabama.  In re Dorsey Trailer Company, Inc., 2007 Bankr. LEXIS 3980 (Bankr. M.D. Ala. 2007) The Court notes, however, that, in Dorsey, the sales process in question was already completed and, as that court itself observed, the Plan's sole task was simply to provide for the disbursement of cash in hand. Id at *4. The Court doubts whether even those facts are sufficient to take matters beyond the reach of LaSalle.  Suffice it to say, however, that the Dorsey facts could scarcely be more different from the present facts, wherein the Debtor proposes to retain control of the Project for the duration of the multi-year liquidation contemplated as the means by which to raise the cash to pay creditors.

In short, the construct of the Debtor's Plan violates the Absolute Priority Rule and on this basis it is, therefore, unconfirmable.

37

### B.  Adequate Protection/Indubitable Equivalence

As discussed above, the only sources of revenue available to the Debtor to fund ongoing operations are rents and the net proceeds from unit sales.  The Debtor's Plan calls for use of "cash collateral" in the form of both the rents and the sales proceeds, both prior to confirmation and thereafter:

> The cash collateral proposal is really an extension of the Debtor's Plan.  The treatment proposed and adequate protection are similar.  The Debtor is seeking cash collateral to continue what it is currently doing – building and selling homes – and roll that process into the Plan following confirmation.

(Debtor's Brief 63)

According to the Debtor, continued construction, sales and marketing, and the continuing investment and support of DVREIF, are all forms of adequate protection to iStar.  Furthermore, says the Debtor, its prospects for reorganization are high, and that additionally demonstrates an additional form of adequate protection for iStar.

The parties, as noted, disagree over whether the two revenue streams are cash collateral in the first place, but they agree that if they are, then iStar must be furnished with "adequate protection" in connection with any usage of the collateral.  The record is clear on how the controversy concerning the rents as cash collateral arises.  Despite lengthy briefing, however, the Debtor's position on the unit sales proceeds as cash collateral is unclear to the Court.

In the former respect (rents) the Debtor acknowledges that iStar holds an assignment of rents as a part of its collateral package. (Stipulated Exhibit #16)

38

However, the Debtor argues that iStar never effectively exercised the assignment because the "direction" letters sent to Barneys and Serafina (directing remittance of rent to iStar) were not written by iStar, do not reference the rent assignment, and do not indicate that iStar was executing on the rent assignment. The Debtor argues that iStar thus failed to properly take constructive possession of the rents in accordance with applicable non-bankruptcy law. As a consequence, says the Debtor, iStar is not entitled to the benefit of the Third Circuit holding in Commerce Bank v Mountain View Village, Inc., 5 F.3d 34 (3d Cir. 1993) (holding that rents assigned to mortgagee were not property of the Debtor's estate and were not cash collateral available for use by the Debtor in its reorganization.)

iStar does not much address the Debtor's challenges to the effectiveness of the exercise of its rent assignment, beyond simply asserting that the letters are effective and that the rents are not cash collateral. iStar similarly asserts, however, that the unit sales proceeds are not cash collateral, here pointing to the terms of its two mortgages (Stipulated Exhibits #12, #13) and what it describes as "hornbook" Pennsylvania law that a mortgage conveys the encumbered realty in fee to the mortgagee (iStar Brief, 129, citing Ladner on Conveyancing in Pennsylvania § 12.27 (4th ed. 1979) ("it should be understood that in the absence of a binding agreement otherwise, a mortgagee is not bound to release any part of mortgaged property without payment of the entire principal and interest"). As with iStar's response on the rent dispute, the Debtor makes only an abbreviated rejoinder. Its argument appears to be that its eventual success in

litigation with iStar will result in the avoidance of iStar's mortgages, thus obviating the issue.

The latter argument, concerning the sales proceeds, is unpersuasive and those are clearly not cash collateral.  The former argument, concerning the rents, presents a closer question.  The Court will not belabor it however.  For purposes of an adequate protection analysis only, the Court will assume arguendo that both sources are cash collateral, because without parsing that question, the Court concludes that the construct of the Plan falls far short of providing the requisite protection to the Debtor's secured creditor either on a pre-confirmation basis, or post-confirmation during the contemplated term of the Plan.[24]  As a consequence, cause to modify the automatic stay exists which, given the circumstances of this case, dictates its dismissal.

The Bankruptcy Code does not expressly define adequate protection, but Bankruptcy Code § 361 states that it may be provided by (1) periodic cash payments; 2)

---

[24]  It is somewhat anomolous to discuss adequate protection for cash collateral usage relative to post-confirmation activities, as these are concepts associated normally with pre-confirmation activity.  It is to some degree semantical, however, as adequate protection concepts ultimately gives way to confirmation requirements which are animated by similar precepts.  See e.g., Contrarian Funds LLC v. Aretex LLC (In re West Point Stevens, Inc.), 600 F.3d 231, 257 (2d Cir. 2010) ("Adequate protection is generally defined as a method by which a secured creditor may apply to the Bankruptcy Court to protect 'its interests against the diminution in value of [its] security during a Bankruptcy proceeding. ... Such adequate protection may manifest in the form of 'cash payments, a lien, or such other relief as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.'" (emphasis added) It might be said that where the Debtor's Plan, as here, contemplates the use of cash from collateral in essentially the same way pre-confirmation and post-confirmation, the failure to provide adequate protection pre-confirmation must necessarily result in a finding that the affected creditor is not receiving the indubitable equivalence of its claim post-confirmation.

additional or replacement liens, or 3) other relief resulting in the "indubitable

equivalent" of the secured creditor's interest in the property in question.  The last

possibility is regarded as a catch all, allowing courts discretion in fashioning the

protection provided to a secured party.

    The Debtor in this case does not propose periodic cash payments or replacement

liens, rather it argues that the terms of its Plan satisfy the last of the above three

examples; to wit: that via its plan iStar, by the completion of the plan, will have

received the indubitable equivalent of its secured claim, and that on a pre and post

confirmation basis iStar is thus adequately protected.  iStar vehemently disagrees with

these prepositions and its arguments are well taken.

    To put the matter in perspective it is best to begin with the Debtor's complete

proposal, as set forth in its Plan:

Article <u>IV</u> - <u>Treatment of Classes of Claim</u>

4.2 **Class 2.**  Alleged Secured Claim of iStar Financial
Inc. And iStar Tara LLC.
...

**2.      Treatment.**

The Debtor proposes an orderly marketing and sale of
the Residential Units and Commercial Units.  The highest
and best value will be achieved through the marketing
efforts of the Debtor and sale of units in the ordinary course.
The Debtor avers that this orderly sales process will take
three to four years and generate Two Hundred Thirty-One
Million dollars of Net Sale Proceeds after reduction for costs
necessary to operate and maintain the Property and any
remaining construction.  Attached as Exhibit "A" hereto is a
detailed projection of the timing and amount of sales of
Residential Units and Commercial Units.  The Net Sale

41

Proceed estimated at $231,000,000, less any costs of administration, maintenance or construction, shall be deposited into the Plan Fund.  The Plan Fund will make no distribution until the conclusion of the later of the CCP Litigation or Bankruptcy Litigation ("Distribution Date") other than the Release Price set forth below and the Monthly Interest payment to Class 2 or the payments to Class 4.

The Class 2 Claim shall be adequately protected during the Sale Period by the following:

a.   The Debtor shall use all Net Sale Proceeds to maintain, insure and secure the Property, satisfy all costs of administration, market and sell Residential Units and Commercial Units in a fair market value manner.  In this manner the Debtor maintains the value of all existing inventory at its highest level thereby maintaining or increasing the value of the Class 2 collateral.

b.   A lien in the Plan Fund to the same extent priority and validity as existed pre-petition and subject to the claims and defenses raised in the CCP Litigation and Bankruptcy Litigation.

c.   The continued investment by ownership of the Debtor in operating, marketing or management costs of the Property which is estimated over the Sale Period at $2,500,000.

d.   Class 2 shall be required to release any lien or security interest in the Residential Unit so long as it receives a payoff of $527/square foot.

e.   Class 2 shall be required to release any lien or security interest in a Commercial Unit so long as it receives net proceeds

42

off any sale but not more than
$11,500,000 in the aggregate.

The Debtor shall pay the Class 2 Claim from the Plan
Fund the amount of $517/square foot of each Residential
Unit Sold.  All remaining proceeds shall be distributed from
the Plan Fund to all other creditors at the Distribution Date.
The Class 2 claim shall bear interest from the Effective Date
at the rate of nine and six tenths percent (9.6%) per annum.
Distributions to Class 2 shall equal the Class 2 Secured Claim
plus the accrued interest. The interest is paid monthly on the
outstanding principal balance on the Class 2 Secured
commencing the first calendar month after Effective date.
From the Petition Date until the Effective Date, the Class 2
Secured Claim shall not be entitled to interest and all
payments made by Debtor from the Plan Fund or by the
Receipt by iStar of any rent payments shall act to reduce the
principal balance of the Class 2 Secured Claim.  The interest
rate was determined on a blended basis in the following
manner: 60% of Class 2 Secured Claim at 6%, 25% of Class
2 Secured Claim at 12% and 15% fo the Class 2 Secured
Claim at 20%.

The Class 2 Claims shall be allowed in the amount
determined in the Bankruptcy Litigation and CCP Litigation
which shall also determine the extent of lien priority.  The
Class 2 claim shall be paid in full from the Plan Fund up to
the amount of the Allowed Claim and in priority determined
in the Bankruptcy Litigation.  All distributions from the Plan
Fund will be made on the Distribution Date other than the
payments to Class 2 of the Release Price and Monthly
Interest to Class 2 and Class 4 payments.  In addition, the
Debtor may use the Plan Fund to satisfy the cumulative
minimum principal payments required to Class 2.

During the Sale Period, so long as the Debtor meets
the minimum sales price requirements for the unit being sold
and is otherwise in compliance with the Plan and pays the
Release Prices, the Class 2 creditor shall release any lien or
mortgage against the Property.  Net Sale Proceeds shall be
used as set forth in the Plan Budget attached hereto as
Exhibit "A."

First Amended Plan,  Art. IV, ¶  4.2 (2), 11-13.

The "Sale Period," for purposes of the above, and as defined in the Plan, means

the time from the petition date to the day upon which occurs the last closing of a

residential unit or commercial unit. (Id. Art. II, ¶ 2.51, 9)

At least two insuperable problems with the above construct are immediately

apparent, but before addressing them it is important to recall the traditional

understanding of the concept of indubitable equivalence.  The concept is understood to

have originated in the decision authored by the distinguished jurist Learned Hand in the

case of In re Murel Holding Corp., 75 F.2d 941 (2d Cir. 1942), as follows:

> It is plain that 'adequate protection' must be completely
> compensatory; and that payment ten years hence is not
> generally the equivalent of payment now. Interest is indeed
> the common measure of the difference, but a creditor who
> fears the safety of his principal will scarcely be content with
> that; he wishes to get his money or at least the property.
> We see no reason to suppose that the statute was intended
> to deprive him of that in the interest of junior holders, unless
> by a substitute of the most indubitable equivalence.

Murel Holding Corp., supra, at 942.

Though broad, the phrase 'indubitable equivalence' has recently been held in this

circuit to be clear.  "Indubitable" means not open to question or doubt, while equivalent

means equal in force or amount, or equal in value.  In re Philadelphia Newspapers, LLC,

et al, 599 F.3d 298, 310 (3d Cir. 2010).

Against this backdrop, the Court returns to the terms of the Debtor's Plan.  What

most stands out is that until the Effective Date of the Plan, iStar is to receive <u>nothing</u>

44

beyond the $517 per square foot release price on sale of a unit.

After the Effective Date, interest at 9.6% per annum is payable on a monthly

basis.  No other payments to iStar are called for until some undetermined date in the

future at which time the Debtor's State Court Claims (and any additional Bankruptcy

Court litigation) have been resolved.  These belated payments are to be made from the

"Plan Fund."  The Plan Fund, however, is subject to immediate, discretionary and

unlimited invasion by the Debtor for a host of reasons, including 1) maintenance of the

property, 2) insurance of the property, 3) security of the property, 4) all costs of

administration, 5) all costs associated with marketing and selling the residential units in

a fair market manner, and 6) amounts needed to satisfy "the cumulative minimum

principal payments required to be paid to iStar."

After the Effective Date, interest at 9.6% per annum is payable on a monthly

Virtually all monies destined for the Plan Fund are to be derived from collateral

on which iStar already holds a first lien.  The Debtor sees nothing problematic with this.

It relies on the recent Third Circuit decision in In re Philadelphia Newspapers, supra,

where a divided panel approved bidding procedures for an auction of the Debtor's

assets, and held that the Debtor might proceed with the auction without providing the

Debtor's secured creditor the right to credit bid its claim. The Court finds this authority

unhelpful to the Debtor herein; principally because in Philadelphia Newspapers, supra,

the collateral at issue was being sold in bulk and the affected creditor was to be

immediately paid the proceeds at a closing to be held in the near term.  Nothing

remotely similar is proposed here.

45

The proposed sell-out period for the Project is estimated, even by the Debtor, to require 3 to 4 years.  In this respect the Debtor's Plan far more resembles In re Murel Holding Corp, itself, where the proposed satisfaction of a secured creditor's claim over an extended plan term was disapproved.  In disapproving it the Court specifically noted that the Plan's proposed interest payments were a mere trifle compared with the debt, and that the Plan's effect was wholly speculative, based upon the expectations of those who had everything to gain and nothing to lose.  This case is strikingly similar.

As with the LaSalle issue, this Court observed the impending dilemma early, advising the Debtor that the Plan construct appeared to run afoul of the teachings to be found in the Third Circuit decision in In re Swedeland Development Group, Inc., 16 F.3d 552 (3d Cir. 1984).  In Swedeland, the Circuit Court held that the whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained pre-bankruptcy, and that a plan proposal dependent upon a pre-petition lender having adequate protection, no matter its form, should as nearly as possible under the circumstances of the case provide the creditor with the value of its bargained for rights. Id. at 564.

That, unquestionably, is not what is being proposed here.  Indeed, iStar, as noted, likens the Debtor's Plan to the transformation of its fixed term construction loan into a revolving line of credit. The analogy is not altogether off the mark.  Beyond payment of the $517 per square foot release price, the Debtor's plan contemplates retention of sales proceeds by the Debtor to fund its post petition operations and to

46

complete the remaining build-out of the Project.  iStar conflates this to an arrangement whereby sales proceeds are created, paid back to iStar, and then re-loaned to the Debtor to generate additional sales proceeds.  While not technically accurate, this is the practical effect of the Debtor's proposed plan.

The Debtor, by contrast, argues that it is iStar that is maliciously seeking to change the parties' bargain.  In this respect the Debtor argues that its plan is simply based on the economic realities that govern all real estate development projects; to wit: that the proceeds of unit sales pay for construction and operations and any remaining dollars are paid to creditors.  The unrebutted testimony on this point, however, belies this contention.  The construction of the Project was to come from the construction loan fund, which began at a certain level and declined over time as draws were disbursed. Under the iStar loan documents, 100% of the net sales proceeds are required to be paid to iStar in exchange for the release of its lien.  (N.T.: 96-97, 124-125, 166-168, 171-173, 3-14-2011) Clearly, the Debtor's plan radically and adversely alters these bargained for contractual rights, and in no reasoned way can it plausibly be maintained that the Debtor's proposal provides iStar with the indubitable equivalence of its claim.

The Court reiterates here its early comments apropros In re Swedeland.  The Debtor argues that Swedeland (concerns over which the Debtor denounces as being a "hobgoblin") involved an attempted priming lien loan under 11 U.S.C. § 364(d) and the Swedeland  Court's finding that the attempt was improper because the Debtor's proposal called for no additional collateral for the existing first lienholder.  This Court

acknowledges that distinction, but it reads Swedeland more expansively.  Swedeland

stands also for the proposition that continued construction and improvements to a

property do not alone constitute adequate protection.  Indeed, the Swedeland Court

specifically rejected the notion that developing property is increased in value simply

because the Debtor may continue with construction which might or might not prove

profitable.  Congress, it said, did not contemplate that a creditor could find its priority

position eroded, and as compensation for the erosion be offered an opportunity to

recoup dependent on the success of a business with inherently risky prospects.  Yet

that is precisely what the Debtor's Plan contemplates.  Rather than receiving 100% of

the net unit sales proceeds in accordance with its loan documents, the Plan requires

iStar to suffer the diversion of some unquantified portion of those proceeds over to the

Debtor for it to use as it deems fit for an array of Project related costs and expenses.

While this case is not on "all fours" with Swedeland, any distinctions, for present

purposes, are legally insignificant.

For the above reasons, the Court finds that the Debtor's Plan fails to provide

adequate protection to iStar, either pre or post confirmation, and that the Plan is

therefore patently unconfirmable.  The latter conclusion, as noted, also follows from the

fact that the Debtor has no other source of funds, and that for want of adequate

protection, stay relief in this single asset realty case is justified.

### C.  Impaired Accepting Classes

The third fatal deficiency, plain from the terms of the Plan, is the Debtor's

inability to satisfy the impaired accepting class requirement of 11 U.S.C. § 1129(a)(10).

This confirmation prerequisite provides, as follows:

> (10) If a class of claims is impaired under the plan, at least
> one class of claims that is impaired under the plan has
> accepted the plan, determined without including any
> acceptance of the plan by any insider.

As this Court has previously observed § 1129(a)(10) operates as a statutory

gatekeeper barring access to cramdown where there is absent even one impaired class

accepting the plan.  Cramdown is a powerful remedy available to plan proponents under

which dissenting classes are compelled to rely on judicial valuations, judgements and

determinations.  The policy underlying § 1129(a)(10) is that before "embarking upon

the tortuous path of cramdown, and compelling the target of the cramdown to shoulder

the risks of error (and related expenses) necessarily associated with forced

confirmation, there must be some other properly classified group that is also hurt and

nonetheless favors the plan.  See In re Curtis Center Limited Partnership, 195 B.R. 631,

636 (Bankr. E.D. Pa 1996), quoting In re 266 Washington Associates, 141 B.R., 275,

287 (Bankr. E.D. N.Y.) aff'd 147 B.R. 827 (E.D. N.Y. 1992).

The Debtor proposes to meet this requirement via an accepting vote by the

single creditor it has placed in Class 3.  The Class 3 Creditor is the Condominium

Homeowners Association:

> "Homeowners Association" means the entity which
> represents the Homeowners or unit owner of 10 Rittenhouse
> pursuant to the master deed and managed by CAMCO
> Management.

49

(Plan Article II, ¶ 2.33, 7)

The treatment proposed under the Plan for the Homeowners Association is set

forth in Article IV at ¶ 4.3, as follows:

> 4.3 **Class 3.** Unsecured Claim of Homeowners
> Association.  Class 3 is impaired.  Except as otherwise
> provided herein, the treatment and consideration to be
> received by Class 3 shall be in full settlement, satisfaction,
> release and discharge of its respective Claims and Liens.
> The Unsecured Claim of the Homeowners Association of 10
> Rittenhouse is $183,313.90.  This claim shall be paid in full
> over twelve months commencing on an Effective Date.  The
> funding for the payments shall come from Net Sale
> Proceeds.  The claim of the Homeowners Association
> accruing after the Petition Date shall be paid on a current
> basis.

First Amended Plan, 13.

iStar argues that the creation of this Class constitutes improper gerrymandering

of the Homeowners Association claim solely to obtain the required vote of an impaired

class.  The Debtor denies this and argues, principally, that the separate classification is

warranted because the Homeowners Association enjoys special statutory rights not

available to the general unsecured creditors in Class V.

iStar contends that the Debtor also seeks to establish justification for separately

classifying the Homeowner Association Claim by reference to the reasons the claim

exists. On this score, iStar notes that at the outset of the proceedings herein, Debtor's

counsel asserted that the only reason the Homeowners Association claim exists is

because iStar improperly refused to honor a draw request which included funds that

would have paid this debt.  Generally speaking, counsel did make such an assertion.

(N.T.: 38, 3-14-2011), and iStar in turn, denied any impropriety, pointing out that the

unrebutted evidence of record establishes that it funded <u>all</u> draw request submitted

prior to the September 1, 2010 loan maturity date, beyond which date it had no legal

obligation to fund any draw requests.  iStar's latter point is well taken, however, it

probably overstates the case to assign this disagreement as the reason for why the

Debtor believes it can legally place the debt in a separate class.  The Debtor does,

however, additionally emphasize that the disparate treatment accorded the

Homeowners Association claim is justified, "as failure to pay this claim in full would be

detrimental to the continued business relationship and would hinder Debtor's ability to

successfully reorganize without the continuation of that relationship." (Debtor's Brief,

22-23)

The statutory provision governing the classification of claims provides only that

claims that are not substantially similar may not be placed in the same class.  In this

respect, Code § 1122 provides:

> **(a)**  Except as provided in subsection (b) of this section, a
> plan may place a claim or an interest in a particular class
> only if such claim or interest is substantially similar to the
> other claims or interests of such class.

Section 1122(a) does not provide, however, that substantially similar claims may

not be placed in separate classes.  In re John Hancock Mut. Life Ins. Co. v. Route 37

Bus. Park Assocs., 987 F.2d 154, 158 (3d Cir. 1993).  It is clear, nevertheless that the

Bankruptcy Code was not meant to allow a Debtor complete freedom to place

substantially similar claims in separate classes. Id.  In that regard, the Third Circuit

51

explained in Matter of Jersey City Medical Center, 817 F.2d 1055, 1061 (3d Cir.1987),

that:

> [T]here must be some limit on a debtor's power to classify
> creditors in such a manner [to assure that at least one class
> of impaired creditors will vote for the plan and make it
> eligible for cram down consideration by the court]. The
> potential for abuse would be significant otherwise. Unless
> there is some requirement of keeping similar claims
> together, nothing would stand in the way of a debtor
> seeking out a few impaired creditors (or even one such
> creditor) who will vote for the plan and placing them in their
> own class.

Id., quoting In re U.S. Truck Co., Inc., 800 F.2d 581, 586 (6th Cir.1986) (footnote
omitted). ]

In John Hancock, the Third Circuit attempted to "spell out the factors that should

be considered in determining whether a classification scheme is reasonable."  Id., 987

F.2d at 159 (emphasis added). In that regard, the court explained:

> [ . . . it seems clear to us that [a reasonableness]
> determination must be informed by the two purposes that
> classification serves under the Code: voting to determine
> whether a plan can be confirmed (see 11 U.S.C. §
> 1129(a)(8), (10) (1988)) and treatment of claims under the
> plan (see 11 U.S.C. § 1123(a)(4) (1988)). Thus, where, as in
> this case, the sole purpose and effect of creating multiple
> classes is to mold the outcome of the voting, it follows that
> the classification scheme must provide a reasonable method
> for counting votes. In a "cram down" case, this means that
> each class must represent a voting interest that is
> sufficiently distinct and weighty to merit a separate voice in
> the decision whether the proposed reorganization should
> proceed. Otherwise, the classification scheme would simply
> constitute a method for circumventing the requirement set
> out in 11 U.S.C. § 1129(a)(10) (1988).

Id. (emphasis added).

With those principles in mind, the Court turns its consideration to the Debtor's proposed classification scheme.

The Court has skepticism as to the Debtor's proffered justification for its separate classification of the Homeowners Association claim.  The Association does enjoy certain "special statutory rights" under the Pennsylvania Uniform Condominium Act.  See 68 Pa. C.S.A. § 3301 et seq.  The Debtor has not identified, however, which of these it believes justifies the Association's separate classification from general unsecured creditors. From the Court's perspective, the only relevant right in this context might be the limited non-divesture at a foreclosure sale of a statutory lien for monthly assessments coming due during the six months immediately preceding the date of a judicial sale.  Id. at § 3315(b)(2)  At this point in time, however, it does not appear that this right will ever be implicated; first, because there is no such sale pending and the case is already five months old, and second, because it is the Court's understanding that on a post-petition basis monthly condominium fees and other expenses of operation are being paid on a current basis.  Moreover, to the extent they are not being paid currently, or to the extent that they subsequently became delinquent, the monthly fees would constitute an expense of administration which would have to be paid on the effective date of confirmation.

Even assuming, however, that the Association's "rights" render it sufficiently distinct for classification purposes, the Circuit Court in John Hancock articulated a two part <u>conjunctive</u> test.  The separately classified class must be sufficiently distinct <u>and</u>

53

weighty.  The Debtor's proposal founders on the second part of the test.  The

Association claim is for approximately $183,000.  Leaving aside the question of whether

the modest impairment (payment over 12 months) is artificial, the size of the claim is de

minimus relative to the aggregate claims in the class from which it has been

segregated.  The Court has no doubt that the separate classification of the Homeowners

Association claim is strictly and solely for the purposes of creating a creditor class which

will vote in favor of the Plan.

Moving beyond this aspect of the Association claim, there is a separate but

equally problematic issue which attends it.  Under § 1129(a)(10) the accepting class

vote determination must be made without including acceptance of the plan by any

insider.  iStar contends that the Debtor cannot satisfy the non-insider limitation because

the Association is controlled by the Debtor's general partner, thus rendering the

Association an insider under Bankruptcy Code § § 101(2), 101(31) (C) and (E).  The

Debtor dismisses this objection, but the Court finds it likewise well taken.

For these purposes the Court looks first to the definition of insider found in §

101(31).  Where, as here, the Debtor is a partnership, the Code provides, as follows:

> **(31)** The term "insider" includes--
>
> > **(C)** if the debtor is a partnership--
> >
> > > **(i)** general partner in the debtor;
> > >
> > > **(ii)** relative of a general partner in, general
> > > partner of, or person in control of the debtor;

> **(iii)** partnership in which the debtor is a
> general partner;
>
> **(iv)** general partner of the debtor; or
>
> **(v)** person in control of the debtor;

11 U.S.C. § 101(31)(C)

In addition, irrespective of the status of the Debtor entity, the term insider also

includes:

> **(E)** affiliate, or insider of an affiliate as if such affiliate were the
> debtor;

11 U.S.C. (31)(E)

Relevant for present purposes, the term affiliate means –

> (A) entity that directly or indirectly owns,
> controls, or holds with power to vote 20
> percent or more of the outstanding voting
> securities of the Debtor, . . . or
>
> (D) entity that operates the business or
> substantially of the property of the Debtor
> under a lease or operating agreement

11 U.S.C. § 101(2)

iStar initially maintains that the Association falls within the ambit of § 101(31)(C),

although it does say which subpart thereof.  The Debtor, for its part, states that the

Association <u>clearly</u> is not an insider under subsection 31(C), as it does not fit any of the

definitions.  The latter point is debatable, and the evidence is inconclusive.  When a

condominium is created the units, initially, are all owned by the Developer.  Voting

rights in the Association are typically allocated to units based on size and at that outset

all voting rights would belong to the Developer.  As sales occur voting rights shift to

purchasers.  Certainly given the status of the Project (107 unsold units as of the time of

the hearing) the Developer controls the Association.  The degree to which the converse

is true; i.e., that as the owner of the unsold unit's voting rights the Association controls

the Developer, cannot be determined without resort to the master deed and the other

underlying governing documents – none of which are part of the record before the

Court.

iStar, as noted, argues alternatively that if the Association is not an insider under

§ 101(31)(C), it is an insider under § 101(31)(E), which pertains to affiliates.  Examining

the definition of affiliate the court notes that a similar debate to the above could be

made with respect to § 101(2), inasmuch as, arguably, the Association, through

CAMCO, is an entity that operates substantially all of the property of the Debtor; to wit:

the units.

The principal face off over the Association's insider status, however, centers on §

101(2)(A).  As noted above, the Debtor clearly controls the Association; even the

Debtor concedes that point.  The Debtor argues, however, that the Association does not

meet the literal definition of an affiliate because the language refers to direct or indirect

control by virtue of the ownership of at least 20% of the voting securities of the

affiliate.  The Homeowners Association, says the Debtor, is a not-for-profit entity

established to maintain the Condominium and, more particularly, that it does not have

any "voting securities."    The Debtor relies on Matter of Emerson Radio Corp., 173 B.R.

490 (D.N.J. 1994), aff'd 52 F.3d 50 (3d Cir. 1995) as support for the overarching

significance of the distinction it stresses, but the decision is unhelpful to the Debtor.    In

Emerson the Court found a corporation to be an affiliate of a Chapter 11 Debtor

because at least 20% of the voting shares of those two entities were owned by a

foreign corporation, <u>despite</u> the fact that the Debtor and the affiliate did not own any

shares in one another. 173 B.R. at 493.    In so holding, the Emerson Court noted that

the use of the phrase 'directly or indirectly' in 11 U.S.C. § 101(2)(A) was intended to

cover situations in which there is an opportunity to control, and where the existence of

that opportunity operates as direct control. Id. n. 2 citing House Report No. 95-595, 95th

Cong. 1st Sess. 309 (1977), U.S. Code Cong. & Admin. News 1978, p. 5772.

Nothing nearly as attenuated as the facts in Emerson is presented here.    In other

words, this is not a situation where there is the potential opportunity for control.    There

is actual control in fact.    There is no dispute whatever that the Debtor holds the

controlling voting rights in the Association.    Mr. Decker, in fact, is the Association's

president.    This makes the Association an affiliate of the Debtor.

The Debtor's fall back position is that because of unit sales some voting rights in

the Association have shifted to third party purchasers, and at present two seats on the

Association's Board of Directors are now held by such third parties.    To defuse the

insider issue the Debtor suggests that the Developer representatives on the Board will

abstain from voting on the Debtor's Plan.    iStar argues that this cannot salvage the

57

situation and the Court agrees.  It is in control of the voting power that gives rise to

insider status.  Whether the person holding the power abstains or not on a particular

vote does not change the holder's status.  As a consequence of this conclusion, the

Court holds that any accepting vote for the Debtor's plan by the Association could not

be counted.  It follows, in turn, that the Debtor has no means by which to satisfy the

requirements of 11 U.S.C. § 1129(a)(10) and its Plan is, therefore, unconfirmable.

**Summary**.

In summary, whether the Court evaluates this case based on an overfly of the

forest or a walk through the thicket of the trees, its impression remains the same.  The

Debtor's good faith in the initiation of this case was legitimately placed at issue.  Once

having been, the Debtor bore the burden of proving subjective good faith intentions and

of negating the objective futility of its Plan, in each case by a preponderance of the

evidence.  The Debtor has failed to meet either burden and the evidence against it on

the many relevant factors discussed herein is exceedingly strong.  As a consequence,

the Chapter 11 case must be dismissed.[25]

---

[25] The Court recognizes that the above disposition leaves undiscussed a variety of issues
raised and argued by the parties, such as the scope of the transfer tax exemption provided for
in Bankruptcy code § 1146(a) and the enforceability of any pre-petition waiver of Bankruptcy
stay protection.  It of course also begs discussion of the many sides to the question of both the
feasibility of the Debtor's Plan and the qualification of its expert witness, Peter Bazeli, questions
to which the parties devoted considerable energy.  Simply put, however, while these issues
were hotly contested they are entirely mooted by the Court's foregoing determinations.  The
Debtor, in other words, could  prevail on all fronts but that would in no way remedy the fatal
deficiencies identified herein.  As a consequence, the Court need not and does not address
itself to every issue and argument raised by the parties, instead confining its findings of fact
and conclusions of law to matters which are of threshold and dispositive significance.  (See,
e.g. Westgate Property Owners v Schleninger, 597 F.2d 1214, 1216 (9th Cir. 1979) (F.R.C.P.
(continued...)

An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: <u>May 25, 2011</u>

---

[25](...continued)
52(a) does not require the Court to expressly respond to or comment on every factual and legal
argument raised by the parties.